UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

JASON WANICK,

    Plaintiff,

v.     02-CV-3358

KEVIN JOHNSON, CNA, and
JOHN CEARLOCK, HCU Administrator,

    Defendants.

FINDINGS OF FACT, CONCLUSIONS OF LAW AND FINAL ORDER

On December 1, 2005, this case was called for trial before the court. The plaintiff, Jason Wanick, appeared personally accompanied by his pro bono, court appointed attorney, Michael Costello, Esq.[1] The defendants, Kevin Johnson and John Cearlock, appeared personally accompanied by their attorneys, Eric J. Rieckenberg and Christopher Higgerson, Assistant Illinois Attorneys General.

This is an action for money damages under the provisions of 42 U.S.C. §1983. The plaintiff, who was an inmate of the Illinois Department of Corrections, (IDOC), claims that the defendants, who were employees of the IDOC at the times complained of in this case, violated his rights under the Eighth Amendment to the United States Constitution. Specifically, the plaintiff claims that the defendants were deliberately indifferent to his serious medical condition while he was in custody and their indifference was a proximate cause of his claimed damages.

The court, having heard the evidence and the remarks of counsel, makes the following findings of fact and conclusions of law.

---

[1] The Court thanks Mr. Costello for his service as pro bono counsel.

The parties have stipulated to the following facts that are uncontested and the court accepts the stipulations as evidence in the case.

1.  On the evening of August 10, 2001, at approximately 10:45 p.m., plaintiff fell from his bunk at the Graham Correctional Center and injured his nose.

2.  Plaintiff was treated following his fall by Registered Nurse Kevin Johnson, who was then in the employ of the Illinois Department of Corrections. Nurse Johnson examined the plaintiff, and provided first aid. A minor laceration was noted, but no nasal deformity, and plaintiff was instructed to report back to the Health Care Unit for sick-call if any difficulty was encountered later.

3.  Nurse Johnson was the only medical provider to treat the plaintiff on the night of August 10, 2001.

4.  Plaintiff was not seen by defendant John Cearlock on the night of August10, 2001.

5.  Plaintiff filed a grievance on August 21, 2001, regarding the treatment he received following his August 10, 2001 injury.

6.  Plaintiff's counselor, Donna Hoff, responded on August 23, 2001, noting that a copy of the grievance had been sent to defendant Cearlock for his response on that same date.

7.  On September 5, 2001, plaintiff's counselor, Donna Hoff, wrote a report regarding plaintiff's grievance. That report indicated that defendant Cearlock's response to plaintiff s grievance was that his review of plaintiff's medical progress notes indicated that on August 10, 2001, plaintiff suffered a minor laceration to the nose, and nothing in plaintiff's medical progress notes indicated a broken nose. Per Counselor Hoff, defendant Cearlock further addressed plaintiff's grievance by stating that plaintiff should go to sick-call if he felt his nose was broken.

8.  Plaintiff did not report back to the Health Care Unit for any follow-up related to his nasal injury until March 8, 2002. On that date, plaintiff was seen by Registered Nurse Diane Sanders, who noted that plaintiff denied having any trouble breathing. Nurse Sanders referred plaintiff to a doctor.

9. On March 28, 2002, plaintiff saw Dr. Siddiqui. At that time, some deformity of the nose was noted and the left nasal passage was found to be partially obstructed. X-rays were ordered.

10. X-rays were completed on April 1, 2002, and revealed an old nasal fracture with minor boney displacement, but normal aeration of the sinuses.

11. Dr. Siddiqui again examined the plaintiff on April 3, 2002. Plaintiff complained of difficulty breathing and Dr. Siddiqui recommended that plaintiff see an ear, nose and throat specialist.

12. The recommendation by Dr. Siddiqui for an ear, nose and throat consult was denied by Health Professionals Ltd. on August 12, 2002.

13. Health Professionals Ltd. suggested follow-up in six (6) weeks.

14. Plaintiff was informed of an alternative treatment plan and was seen by Dr. Roderick Matticks on August 5, August 15 and September 11, 2002. At these times, plaintiff complained of headaches and was prescribed Tylenol for pain relief.

15. On October 4, 2002, Dr. Matticks examined the plaintiff for the recommended six (6) week follow-up. As a result, a second request for an ear, nose and throat consult was requested. This consult was approved by Health Professionals Ltd. on October 10, 2002 and plaintiff was referred to ear, nose and throat specialist Dr. Lloyd Thompson.

16. On October 29, 2002, plaintiff was seen by Dr. Thompson. Dr. Thompson noted that plaintiff had a prior injury to his nose.

17. Plaintiff's nose was injured during childhood. At approximately five (5) years of age, plaintiff's sister hit him in the nose.

18. On November 7, 2002, Dr. Thompson conducted nasal septoplasty with a good post-operative course and no further problems noted. During the procedure, Dr. Thompson noted that the majority of plaintiff s nasal problems were the result of an old injury.

II.

The court makes the following additional findings based upon the evidence presented during trial:

19. The plaintiff testified that, when he was taken to the health unit on the night he fell and injured his nose, his face was swollen, his nose was huge and crooked and his eyes were turning black. Johnson testified, and Wanick's medical records state, that swelling on the right side of his nose was observed, superficial lacerations on each side of his nose were present. No respiratory distress was observed. There was some dried blood under Wanick's nose. Bruising was not present and would take time to appear. Johnson, who is a registered nurse, made the entries in the medical records contemporaneously with the time Wanick presented himself for examination and treatment. There is no apparent reason that Johnson would have recorded anything except what he saw and how he treated Wanick. Wanick never saw Johnson again following that initial visit to the health care unit. There is no evidentiary basis for the claim that Johnson exhibited a deliberate indifference to Wanick's physical condition, or that he denied Wanick treatment that was obviously necessary for an apparent, serious medical condition. *See Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005)(conduct is "deliberately indifferent" when defendant acts intentionally or in criminally reckless manner--"the defendant must have known that the plaintiff 'was at serious risk of being harmed [and] decided not to do anything to prevent that harm from occurring'"); *Collingnon v. Milwaukee County*, 163 F.3d 982, 989 (7th Cir. 1998)(deliberate indifference may be established if "response so inadequate that it demonstrated an absence of professional judgment, that is, that nominally competent professional would not have so responded under the circumstances.").

20. The grievance officer handling the plaintiff's August 2001 grievance recommended that the plaintiff see a doctor to determine the extent of the nose injury. The warden concurred in this recommendation. However, the plaintiff did not see a doctor until March 2002. The plaintiff testified that he sent many requests to visit the health care unit between the date of the grievance officer's recommendation and his March visit to HCU, including two letters directly to Cearlock. The Court believes Cearlock's testimony that Cearlock did not receive and was not aware of these requests or letters, nor the grievance officer's recommendation that the plaintiff see a doctor.

21.  Dr. Siddiqui saw the plaintiff on March 28, 2002 and recommended that Wanick see an outside ears, nose and throat (ENT) in April 2002, but, unbeknownst to Cearlock, failed to forward the recommendation forms to the IDOC health care vendor.  In July 2002 Wanick saw the AssistantWarden in the institution garage where Wanick worked.  Wanick complained to the warden about his nose, who said he would look into the matter.  Cearlock received a memorandum from the warden in July 2002 instructing him to look into Wanick's case.  Cearlock did so and at that time discovered that Dr. Siddiqui's recommendation of an ENT consult had not been forwarded to the institution's health care vendor.  Cearlock had Wanick go to the health care unit for further examination.  As a result Wanick was referred to a Dr. Matticks who recommended referring Wanick to an ENT.  The recommendation was denied by the vendor at first, but after a six week follow up visit to Dr. Maddox, Wanick's referral to an ENT was approved.

22.  Wanick subsequently saw Dr. Lloyd E. Thompson, an otolaryngologist in Belleville, Illinois, in October 2002.  Wanick was scheduled for surgery that was performed on November 7, 2002, and Wanick's deviated nasal septum was corrected.  Wanick was seen postoperatively by Dr. Thompson who found the operation was a success and the recovery uneventful.

23.  Dr. Thompson's observations about a deviated nasal septum are interesting.  In response to a question about Wanick experiencing breathing problems, Thompson said, "He may have, although he did not report that to me." Dep. P. 11.  Asked whether Wanick was experiencing respiratory distress, Dr. Thompson said, "He was having difficulty breathing through his nose, but respiratory?  I guess not." Dep. P. 21.  When asked whether people with a deviated septum go for many years without treatment, he responded, "Yes."  When asked if a deviated septum was "a serious medical condition" he answered, "It is not; but there are reports which would indicate that it can lead to serious medical indications.  It of itself is not, but there are indication [sic] in some people that it can lead to serious medical problems."  Dr. Thompson also said that most individuals who have deviated septum live normal lives without any sort of problems.

24.  The Eighth Amendment test for denial of medical care for a serious medical condition is deliberate indifference.  *Wynn v. Southward*, 251 F.3d 588, 593 (Deliberate indifference "requires the prisoner to show that the prison official was subjectively aware of the prisoner's serious medical needs and disregarded an excessive risk that a lack of treatment posed to the prisoner's health or safety from lack of treatment.").  Cearlock, as the health care administrator

who was responsible for setting policy and insuring adherence to the policy, reviewed Wanick's initial grievance about his initial care and concluded that it was appropriate up until that time. Subsequent to that determination Dr. Siddiqui recommended consultation with an ENT, but through apparent inadvertence failed to send that recommendation to the IDOC health care vendor. Cearlock was unaware of that failure until the Assistant Warden called Wanick's case to Cearlock's attention in July 2002. Cearlock took immediate steps to rectify the oversight, and Wanick was seen by Dr. Matticks and referred for corrective surgery as described above. Nothing in that sequence of events suggests to the court that Cearlock was deliberately indifferent to Wanick's health needs. Added to that Dr. Thompson's observations about whether Wanick's condition would be considered a serious medical condition easily discerned by someone other than a physician reinforce the court's conclusion that there was no deliberate indifference to a serious medical condition. Granted that in a free society Wanick might have had more prompt attention to what was an uncomfortable physical condition, that still does not raise the occurrences here to the level of a constitutional tort.

The court accordingly finds in favor of both defendants and against the plaintiff. The clerk is directed to enter judgment in favor of the defendants and against the plaintiff. All pending motions are denied as moot and this case is closed. The parties shall bear their own costs.

Entered this 9th Day of March, 2006.

s\Harold A. Baker

HAROLD A. BAKER
UNITED STATES DISTRICT JUDGE